UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| CHRISTINE CHRISTOFFERSON,<br><br>Plaintiff,<br><br>vs.<br><br>NANCY A. BERRYHILL, Acting<br>Commissioner of Social Security,<br><br>Defendant. | CIV. 16-5070-JLV<br><br><br>ORDER |

Plaintiff Christine Christofferson filed a complaint appealing the final decision of Nancy A. Berryhill, the Acting Commissioner of the Social Security Administration, finding plaintiff not disabled. (Docket 1). Defendant denies plaintiff is entitled to benefits. (Docket 9). The court issued a briefing schedule requiring the parties to file a joint statement of material facts ("JSMF"). (Docket 11). The parties filed their JSMF. (Docket 14). For the reasons stated below, plaintiff's motion to reverse the decision of the Commissioner (Docket 15) is granted and defendant's motion to affirm the decision of the Commissioner (Docket 17) is denied.

## FACTUAL AND PROCEDURAL HISTORY

The parties' JSMF (Docket 14) is incorporated by reference. Further recitation of salient facts is incorporated in the discussion section of this order.

Plaintiff filed an application for social security disability insurance benefits ("DIB") alleging an onset of disability date of March 28, 2013. Id. ¶ 1.

An administrative law judge ("ALJ") issued a decision finding plaintiff was not disabled.  Id. ¶ 3; see also Administrative Record at pp. 138-50 (hereinafter "AR at p. ___").  Plaintiff requested review of the ALJ's decision and the Appeals Council denied her request for review and affirmed the ALJ's decision.  (Docket 14 ¶ 6).  The ALJ's decision constitutes the final decision of the Commissioner of the Social Security Administration.  It is from this decision which plaintiff timely appeals.

The issue before the court is whether the ALJ's decision that Ms. Christofferson was not "under a disability, as defined in the Social Security Act, at any time from March 28, 2013, [through April 24, 2015]" is supported by the substantial evidence in the record as a whole.  (AR at p. 150) (bold omitted); see also Howard v. Massanari, 255 F.3d 577, 580 (8th Cir. 2001) ("By statute, the findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive.") (internal quotation marks and brackets omitted) (citing 42 U.S.C. § 405(g)).

## STANDARD OF REVIEW

The Commissioner's findings must be upheld if they are supported by substantial evidence in the record as a whole.  42 U.S.C. § 405(g); Choate v. Barnhart, 457 F.3d 865, 869 (8th Cir. 2006); Howard, 255 F.3d at 580.  The court reviews the Commissioner's decision to determine if an error of law was committed.  Smith v. Sullivan, 982 F.2d 308, 311 (8th Cir. 1992).  "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion."  Cox v.

Barnhart, 471 F.3d 902, 906 (8th Cir. 2006) (internal citation and quotation marks omitted).

The review of a decision to deny benefits is "more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision . . . [the court must also] take into account whatever in the record fairly detracts from that decision." Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005) (quoting Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001)).

It is not the role of the court to re-weigh the evidence and, even if this court would decide the case differently, it cannot reverse the Commissioner's decision if that decision is supported by good reason and is based on substantial evidence. Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005). A reviewing court may not reverse the Commissioner's decision " 'merely because substantial evidence would have supported an opposite decision.' " Reed, 399 F.3d at 920 (quoting Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995)). Issues of law are reviewed *de novo* with deference given to the Commissioner's construction of the Social Security Act. See Smith, 982 F.2d at 311.

The Social Security Administration established a five-step sequential evaluation process for determining whether an individual is disabled and entitled to DIB benefits under Title II. 20 CFR § 404.1520(a). If the ALJ determines a claimant is not disabled at any step of the process, the evaluation

3

does not proceed to the next step as the claimant is not disabled.  Id.  The five-step sequential evaluation process is:

> (1) whether the claimant is presently engaged in a "substantial gainful activity"; (2) whether the claimant has a severe impairment—one that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations (if so, the claimant is disabled without regard to age, education, and work experience); (4) whether the claimant has the residual functional capacity to perform . . . past relevant work; and (5) if the claimant cannot perform the past work, the burden shifts to the Commissioner to prove there are other jobs in the national economy the claimant can perform.

Baker v. Apfel, 159 F.3d 1140, 1143-44 (8th Cir. 1998).  See also Boyd v. Sullivan, 960 F.2d 733, 735 (8th Cir. 1992).  The ALJ applied the five-step sequential evaluation required by the Social Security Administration regulations.  (AR at pp. 139-40; see also Docket 14 ¶¶ 179-85).

### STEP ONE

At step one, the ALJ determined plaintiff had "not [been] engaged in substantial gainful activity since  March 28, 2013, the alleged onset date." (AR at p. 140).

### STEP TWO

"At the second step, [the agency] consider[s] the medical severity of your impairment(s)."  20 CFR § 404.1520(a)(4)(ii).  "It is the claimant's burden to establish that [her] impairment or combination of impairments are severe." Kirby v. Astrue, 500 F.3d 705, 707 (8th Cir. 2007).  A severe impairment is defined as one which significantly limits a physical or mental ability to do basic work activities.  20 CFR § 404.1521.  An impairment is not severe, however, if

it "amounts to only a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." Kirby, 500 F.3d at 707. "If the impairment would have no more than a minimal effect on the claimant's ability to work, then it does not satisfy the requirement of step two." Id. (citation omitted). Additionally, the impairment must have lasted at least twelve months or be expected to result in death. See 20 CFR § 404.1509.

The ALJ found Ms. Christofferson suffered from "the following severe impairments: degenerative disc disease of the lumbar and thoracic spine, osteoarthritis of the left knee, right ankle degenerative changes, and obesity." (Docket 14 ¶ 180). Ms. Christofferson challenges this finding. (Docket 16 at pp. 16-20).

Ms. Christofferson asserts the ALJ failed to address the following impairments and to find them severe:

Curvature of the spine;

Spinal central canal stenosis;

Calcaneal spurs bilaterally, and chronic plantar fasciitis;[1]

Pedicle fractures at L4 [and] L5;

Right knee degenerative disease;

---

[1]"Plantar fasciitis and calcaneal spurs. The plantar fascia is the thick tissue on the bottom of the foot. It connects the heel bone to the toes and creates the arch of the foot. When this tissue becomes swollen or inflamed, it is called plantar fasciitis." (Docket 14 at p. 68).

Degenerative arthritis and impingement of the left hip with marked weakness of hip flexors;[2]

Painful hand with mild to moderate degenerative joint disease in both hands, also with numbness and weakness treated with a wrist splint;

Weakness and atrophy of scapular girdle and shoulders;

Chronic pain, or chronic pain syndrome; and

Sjogren's, or "sicca," autoimmune inflammatory disease.[3]

Id. at p. 17.  Plaintiff identifies these medical conditions in her argument, including the diagnoses, medical treatment and her response to those treatments.  Id. at pp. 3-12.  But, plaintiff fails to point to any medical record which asserts any one or more of these conditions are severe.  Id. at pp. 16-20.

The medical records reference these conditions but identify them as either mild or responsive to injections, medications, physical therapy or other therapies.  See Docket 14.  A diagnosis of a medical condition without

---

[2]"Primary degenerative arthritis, also called osteoarthritis, mostly affects cartilage, the hard but slippery tissue that covers the ends of bones where they meet to form a joint. . . . In osteoarthritis, the surface layer of cartilage breaks and wears away.  This allows bones under the cartilage to rub together, causing pain, swelling, and loss of motion of the joint.  Over time, the joint may lose its normal shape.  Also, small deposits of bone—called osteophytes or bone spurs—may grow on the edges of the joint.  Bits of bone or cartilage can break off and float inside the joint space."  (Docket 14 at pp. 68-69).

[3]"Sicca syndrome: An autoimmune disease, also known as Sjogren syndrome, that classically combines dry eyes, dry mouth, and another disease of connective tissue such as rheumatoid arthritis (most common), lupus, scleroderma or polymyositis. . . . Sjogren syndrome is an autoimmune disorder in which the body's immune system mistakenly reacts to the tissue in glands that produce moisture, such as tear and salivary glands.  It is a chronic, inflammatory disease that often progresses to a more complex, systemic disorder. . . . Secondary Sjögren syndrome—occurs when a person already has an autoimmune disorder, such as lupus, polymyositis, scleroderma, or rheumatoid arthritis."  (Docket 14 at p. 71).

objective evidence of functional impairment is insufficient to find an impairment severe.[4] Kirby, 500 F.3d at 707.  Plaintiff also asserts the decision of the ALJ must be reversed because the Appeals Council failed to remand for consideration at step two of her post-hearing diagnosis of fibromyalgia.[5] (Docket 16 at p. 18).   Ms. Christofferson argues her diagnosis of fibromyalgia, "less than six months after the ALJ's decision" is "new, material, and related back to the adjudicative period" because it "was based upon ongoing extreme chronic fatigue and generalized nonfocal pain . . . whole-body stiffness and pain, aching and sharp, aggravated by movement, walking and standing . . . that predated the ALJ's decision."  Id. (referencing Docket 14 ¶ 141).   Ms. Christofferson points out she has "been on Lyrica for three years."[6]  Id.

Ms. Christofferson submitted additional medical records to the Appeals Council as part of the appeal process.  (Docket 14 ¶¶ 6).  The Appeals Council applied exhibit labels to the medical records dated prior to April, 25, 2015, the

---

[4]Ms. Christofferson's chronic pain will be discussed later in this order.

[5]Fibromyalgia is "[a] syndrome of chronic pain of musculoskeletal origin but uncertain cause.  The American College of Rheumatology has established diagnostic criteria that include pain on both sides of the body, both above and below the waist, as well as in an axial distribution (cervical, thoracic, or lumbar spine or anterior chest). . . ."  Stedman's Medical Dictionary 148730 (27th ed. 2000).

[6]"Lyrica . . . is used to treat neuropathic pain and fibromyalgia."  (Docket 14 at p. 74).

date of the ALJ's decision.  Id. (referencing AR at pp. 729-810).[7]   The Appeals

Council concluded the medical records predating April 25, 2015, did not form a

basis for modification of the ALJ's decision.  Id. ¶ 6 (referencing AR at p. 2).

The Appeals Council did not apply exhibit labels to the medical records

dated after April 25, 2015.  Id. ¶ 7 (referencing AR at pp. 9-75 and 80-134).[8]

The Appeals Council concluded these medical records were "about a later time.

Therefore, it does not affect the decision about whether you were disabled

beginning on or before April 24, 2015. "  Id. ¶ 7 (referencing AR at p. 2).

The Commissioner argues the "[c]ourt does not have jurisdiction to

review the Appeals Council action because [it] denied Plaintiff's request for

review."  (Docket 18 at p. 6) (citations omitted).  The Commissioner agrees the

"[c]ourt may consider new evidence as part of the record as a whole, in

determining whether substantial evidence supports the ALJ's decision."  Id. at

p. 7 (citation omitted).

The Social Security Regulations contemplate the potential for the

submission of additional medical evidence after an ALJ's decision.

> The Appeals Council will review a case if . . . the Appeals Council
> receives additional evidence that is new, material, and relates to
> the period on or before the date of the hearing decision, and there

---

[7]The court finds the medical records appear in the administrative record.
(AR pp. 729-819; see also, the Appeals Council's order which marked
additional exhibits, AR at pp. 6-7).  Some of these records are referenced in the
chronological entry of medical records of the JSMF.  See Docket 14 ¶¶ 22-27,
29, 51-52, 55, 83 & 85-86.  Because these medical records were not part of the
administrative record until the appeal process, they were not considered by the
ALJ.

[8]These post-decision medical records appear in the chronology of the
JSMF.  (Docket 14 ¶¶ 88-149).

is a reasonable probability that the additional evidence would
change the outcome of the decision. . . . The Appeals Council will
only consider additional evidence . . . if you show good cause. . . .

20 CFR §§ 404.970(a)(5) and (b). The court "may remand a case to have

additional evidence taken 'but only upon a showing that there is new evidence

which is material and that there is good cause for the failure to incorporate

such evidence into the record in a prior proceeding.' " Hepp v. Astrue, 511

F.3d 798, 808 (8th Cir. 2008) (quoting 42 U.S.C. § 405(g)); see also Box v.

Shalala, 52 F.3d 168, 171 (8th Cir. 1995). "To be material, new evidence must

be non-cumulative, relevant, and probative of the claimant's condition for the

time period for which benefits were denied, and there must be a reasonable

likelihood that it would have changed the Secretary's determination." Woolf v.

Shalala, 3 F.3d 1210, 1215 (8th Cir. 1993). "To be 'material,' the evidence

must be relevant to claimant's condition for the time period for which benefits

were denied. . . . Thus, to qualify as 'material,' the additional evidence must not

merely detail after-acquired conditions or post-decision deterioration of a pre-

existing condition." Bergmann v. Apfel, 207 F.3d 1065, 1069-70 (8th Cir.

2000). "Good cause does not exist when the claimant had the opportunity to

obtain the new evidence before the administrative record closed but failed to do

so without providing a sufficient explanation." Hepp, 511 F.3d at 808.

The court reviewed the medical records which were marked and

incorporated into the administrative record by the Appeals Council.[9] (Docket

14 ¶¶ 22-27, 29, 51-52, 55, 83 & 85-86). The court finds these records do not

[9]The parties have not explained why these medical records were not part
of the record before the ALJ.

provide any "new" or "non-cumulative" information which would create "a reasonable likelihood that it would have changed the [ALJ's] determination." Woolf, 3 F.3d at 1215.

The post-decision medical records are a different matter. The last medical record predating the ALJ's decision of April 25, 2015, is the February 17, 2015, report of Dr. Peterson. (Docket 14 ¶ 87). Dr. Peterson charted Ms. Christofferson's complaints: "her pain was flaring again and mid back pain was described as burning and stabbing. . . . the left hip injection in October 2014 had provided relief until about a month ago. . . . Back symptoms were aggravated by daily activities and all movements, and were relieved by heat, ice, and over the counter medication. . . . [She] reported no extremity weakness or gait disturbance." Id. Ms. Christofferson's list of medications that day included: "Acetaminophen Extra Strength [2 tablets every 6 hours as needed] . . . Alendronate[10] [1 tablet weekly] . . . Alprazolam[11] [1/2 to 1 tablet every 8 hours prn for extreme anxiety] . . . Bupropion[12] [1 tablet daily] . . . Coreg[13]

---

[10]"Alendronate (Fosamax), a bisphosphonate used to treat and prevent osteoporosis." (Docket 14 at p. 73).

[11]"Alprazolam (Xanax), a benzodiazepine used to treat panic attacks and . . . anxiety disorders." (Docket 14 at p. 73).

[12]"Bupropion (Wellbutrin), an antidepressant used to treat depression and also to help people stop smoking." (Docket 14 at p. 73).

[13]"Coreg (Carvedilol), is a beta blocker used to treat heart failure and high blood pressure." (Docket 14 at p. 73).

[1 tablet 2 times daily] . . . Lidoderm patch[14] [1 patch daily prn] . . . Losartan[15] [1 tablet daily] . . . Lyrica [1 tablet daily] . . . Omeprazole[16] [1 tablet 2 times daily] . . . Tramadol[17] [2 tablets 1-2 times daily prn] . . . Rizatriptan[18] [1 tablet prn, may repeat at 2 hour intervals]."  (AR at p. 721).

Dr. Peterson's physical examination disclosed "left hip tenderness, thoracic tenderness, and right ankle lateral swelling. . . . right hip was normal, and bilateral lower extremity sensation was good. . . . sitting root test was negative." Id. at 722.  Dr. Peterson's assessment included "enthesopathy [pain and inflammation] of the left hip, sciatica, and ankle sprain." Id.  Dr. Peterson injected Ms. Christofferson's left hip. Id.  Thoracic spine x-rays taken that day "showed a slight increase in the moderate lower thoracic curve complex."[19] (Docket 14 ¶ 87).  Dr. Peterson referred Ms. Christofferson to Dr. Robert Woodruff at the Black Hills Orthopedic and Spine Center in Rapid City, South

---

[14]"Lidoderm Patch (transdermal patch) is a local anesthetic used to relieve the pain of post-herpetic neuralgia."  (Docket 14 at p. 74).

[15]"Losartan (Cozaar), is an angiotensin II receptor antagonist used to treat high blood pressure."  (Docket 14 at p. 74).

[16]"Omeprazole (Prilosec) is a proton pump inhibitor used to treat GERD."  (Docket 14 at p. 75).

[17]"Tramadol (Ultram) is a narcotic medication used to relieve moderate to moderately severe pain."  (Docket 14 at p. 75).

[18]"Rizatriptan (Maxalt) is a SSR agonist used to treat migraine headaches."  (Docket 14 at p. 75).

[19]" 'Moderate' scoliosis is a defined term, and a prognostic indicator.  It means a 26-to 40-degree curve and a 68 percent chance of progression."  (Docket 14 ¶ 87 n.15).

Dakota.  Id. ¶ 88.  Dr. Woodruff is an orthopedic surgeon specializing in conditions involving the back, neck and spine.  Id.

Starting just 12 days after the April 25, 2015, decision of the ALJ, the medical records amplify the severity of Ms. Christofferson's chronic pain.  On May 7, 2015, Dr. Woodruff charted "[o]ver time her pain ha[s] become more severe and more constant.  On average, she rated her symptoms as 4/10." (Docket 14 ¶ 88).  Her pain level "can be as bad as an 8/10."  (AR at p. 131). "She had tried physical therapy, chiropractic, heat, ice, Lyrica, Lidocaine patches, Tylenol, and Gabapentin,[20] epidural injections, and facet injection[s]." (Docket 14 ¶ 88).  "Dr. Woodruff assessed idiopathic thoracic (primarily) scoliosis since adolescence, which had progressed."  Id. ¶ 89.

On May 19, 2015, a physical therapist with Black Hills Physical Therapy of Rapid City noted Ms. Christofferson's "reported current functional limitations: disturbed sleep, limitations with household chores, reaching forward or up with bilateral upper extremities, maintaining a body position, and carrying any weight."  Id. ¶¶ 93-94.  "The physical therapy diagnoses were scoliosis T-L spine, left side rib inhalation restriction, weak scapular girdle (left greater than right), pain in left ribs and thoracic spine, and poor compliance with exercise."  Id. ¶ 98.  Subsequent physical therapy sessions showed some improvement.  Id. ¶¶ 100-03.  But on June 9, 2015, her symptoms persisted. Id. ¶ 103.

---

[20]Gabapentin is the generic name for Neurontin and is often prescribed to treat chronic nerve pain and fibromyalgia.
https://www.mayoclinic.org/diseases-conditions/fibromyalgia/expert-answers/fibromyalgia-treatment/faq-20058273.

During a June 25, 2015, appointment with Dr. Woodruff, Ms. Christofferson reported a "20 percent improvement after physical therapy." Id. ¶ 106. "[S]he rated her average pain at 4 to 5/10." Id. Dr. Woodruff's examination found "normal" or "negative" responses to his manipulations. Id.

On July 13, 2015, Ms. Christofferson saw Dr. Jensen, a psychiatrist, with Black Hills Psychiatry. Id. ¶ 110. Dr. Jensen charted:

> [Ms.] Christofferson reported low energy, decreased motivation, and difficulty focusing. She had chronic insomnia that she felt was due to pain. She stated that she used to be physically active but had difficulty with activities due to her chronic pain. She spent her day doing house projects but was often frustrated with herself that it took longer than she thought it should.

Id. ¶ 111. Dr. Jensen noted the positive factors in Ms. Christofferson's life "included her supportive children and her interest in going back to her career." Id. ¶ 114. "Negative factors included her chronic pain limiting function and her limited response to medication in the past." Id. "Dr. Jensen diagnosed major depressive disorder, recurrent, moderate, and anxiety state. . . . [and her] depression was only partially resolved with Wellbutrin and recommended augmenting this with Prozac." Id. ¶¶ 114-15.

On July 14, 2015, the physical therapist noted "[Ms.] Christofferson was 80% better and the pinch pain at her left ribs was 40% better. . . . [Her] [c]urrent functional limitations were disturbed sleep, anything reaching forward or up with bilateral upper extremities, maintaining a body position, and carrying any weight with hands or arms. She had depression. Her mental status/cognitive function did not appear impaired. . . . She had full strength. She had continued left hip pain, but HEP [home exercise program] had resolved

13

her greater trochanter symptoms. . . . She had pain into the left groin and thigh." Id. ¶116.

On July 22, 2015, Dr. Dietrich "administered a thoracic trigger point injection." Id. ¶ 117. Dr. Dietrich, a physiatrist whose specialty is pain management, had been treating Ms. Christofferson since October 2011. Id. ¶¶ 30-31, 36-37, 39, 45, 47, 49 & 53.

On July 29, 2015, Ms. Christofferson reported to a physician's assistant at Regional Health in Rapid City that she was having "a hard time sleeping at night due to the pain in her hip, from arthritis and bursitis. . . . [She] reported her pain at 4/10. . . . [T]he pain was chronic, aggravated by standing, lying down, and walking." Id. ¶ 118. Relevant to the current issues, the PA charted Ms. Christofferson's medical problems as "depressive disorder, . . . hypertension, arthritis, pain in wrist, hip pain, spinal stenosis of lumbar region, trochanteric bursitis, disorder of bone and articular cartilage, . . . abdominal pain, current tear of lateral cartilage and/or meniscus of knee, neck sprain, and osteoarthritis." Id. ¶ 119.

On August 10, 2015, Dr. Jensen charted Ms. Christofferson "was in physical therapy and was trying to decrease her pain medications." Id. ¶ 123. Dr. Jensen increased her Prozac and "assessed a slight improvement in [her] mood with psychotherapy, Prozac, and decreased alcohol use." Id.

On August 11, 2015, another physical therapist worked with Ms. Christofferson as she reported "complaints of pain in the left hip and buttock, anterior thigh and anterolateral lower leg." Id. ¶ 124. Extensive manipulation

and testing was completed.  Id. ¶ 128-31.  The physical therapist charted that Ms. Christofferson's "rehabilitation potential was 'good.' "  Id. ¶ 131.

On September 3, 2015, Ms. Christofferson returned to PA Millis.  Id. ¶ 132.  PA Millis charted "tenderness of the SI joint and the left greater trochanter. . . . active and passive left hip range of motion were normal, with pain elicited by passive range of motion on the left. . . . The Ober's test was positive. . . . Abduction strength on the left was 3/5. . . . no tenderness of the hip flexor muscles on the right, and no tenderness of the hip flexor or abductor muscles on the left. . . . gait was normal, she did not limp, and she ambulated without an assistive device."  Id.

On September 18, 2015, Ms. Christofferson returned to Dr. Jensen "for a medication check."  Id. ¶ 135.  Although Ms. Christofferson was pleased about being able to do a weekend project with her son, "[s]he still reported chronic pain."  Id.  Dr. Jensen charted Ms. Christofferson as "cooperative, her eye contact was good, her psychomotor activity was normal, her memory and language were intact, and her insight and judgment were fair. . . . She exhibited mild depression that was improving. . . . Her gait and station were normal."  Id.  Dr. Jensen continued Ms. Christofferson "on Prozac 30 mg. and Wellbutrin 300 mg., as these were working well for her."  Id.

Following a steroid injection of Ms. Christofferson's left hip two weeks earlier, on September 23, 2015, she reported to PA Millis that she "was 'doing well' and experienced 60 percent improvement after the injection . . . . Pain was still 4/10."  Id. ¶ 134.  The PA charted "her 'Review of Symptoms' . . . endorsed

pain with activity and rest but did not endorse muscle aches or weakness, musculoskeletal pain, back pain, arthralgis/joint pain, localized joint stiffness, swelling in the extremities, crepitus with movement, catching or locking." Id.

On September 29, 2015, Ms. Christofferson reported to her physical therapist that "she had met her physical therapy goals, and [was] feeling at least 60 percent better. . . . [With left hip pain at] 2/10 . . . ." Id. ¶ 138. Ms. Christofferson felt "able to return to aquatic therapy without limitation due to left hip pain. . . . She was able to perform normal daily activities such as cooking and cleaning without limitation due to left hip pain." Id. She was encouraged to continue with exercise and aquatic therapy. Id.

On October 8, 2015, Ms. Christofferson returned to Dr. Dietrich. Id. ¶ 139. In her Review of Symptoms, Dr. Dietrich charted she "did not endorse depression, anxiety, or mood swings, musculoskeletal numbness, tingling, warmth, swelling, burning, spasm, or weakness. . . . She endorsed diffuse neck pain, back pain, upper extremity paresthesias, and mid thoracic pain." Id. Upon examination, Dr. Dietrich noted "she was alert and oriented, and she ambulated and transitioned independently. She had diffuse tenderness in the low back/lumbosacral region, pain in the mid thoracic region, and paresthesias into her bilateral upper extremities, but no focal strength deficits." Id. The doctor's diagnosis included "cervical, thoracic, and lumbar degenerative disc disease, question of Sjogren's, and chronic pain." Id.

On October 13, 2015, Ms. Christofferson returned to Dr. Bassing, her rheumatologist. Id. ¶ 141. Dr. Bassing charted that Ms. Christofferson

"reported constant and worsening joint pain and whole-body stiffness and pain, which was aching and sharp, aggravated by movement, walking and standing, and relieved by injection, mobility, and Motrin. . . . . Associated symptoms included decreased mobility, joint tenderness, nocturnal awakening, nocturnal pain, weakness, and stiffness." Id.   On examination, Dr. Bassing found that she "had diffuse very chronic non-articular tenderness, even to touch; and she had fatigue—this was fibromyalgia. . . . She had multiple tender trigger points." Id. ¶ 143.  Quantitative data supported the doctor's observations and conclusion. Id.   Dr. Bassing's diagnoses included "fibromyalgia, Sicca syndrome, primary generalized osteoarthritis, and 'very chronic ankle symptoms and axial spine symptoms.' . . . Her most bothersome symptoms continue to be extreme chronic fatigue and generalized nonfocal pain." Id. ¶ 146.  Dr. Bassing encouraged Ms. Christofferson to do routine aerobic exercise and physical activity. Id.

On December 8, 2015, Dr. Dietrich met with Ms. Christofferson. Id. ¶ 148.

> On examination, Dr. Dietrich noted scoliotic spine formation, significant tenderness in thoracic spine and thoracic trigger point, decreased hip range of motion with pain, and soft-tissue swelling in the thoracic spine. . . . [She] was in no acute distress, her gait, squatting, tandem gait, and Romberg test were normal, and she was able to heel and toe walk without difficulty. . . . Her strength testing was normal and symmetric.   She had scoliotic spine formation with "significant tenderness in the thoracic spine and thoracic trigger point, decreased hip range of motion, and pain with internal greater than external range of motion."

Id.   Dr. Dietrich's diagnosis included: "1) Chronic pain syndrome, 2) Thoracic trigger point, 3) Hip DJD [degenerative joint disease], 4) Sjogren's syndrome,

5) Scoliosis, and 6) Fibromyalgia." Id.  He "administered left thoracic trigger point injections." Id.

On December 10, 2015, Ms. Christofferson saw Dr. Woodruff for a review of her spinal scoliosis. Id. ¶ 149.  Dr. Woodruff concluded "[s]he has quite a few problems that I do not think are related to her back. However, I do think her left thoracic pain is related to the thoracic rib prominence and abnormal scapulothoracic intramuscular injections." Id. He encouraged her to "continue with physical therapy and intramuscular injections. . . . [And] seek[] treatment for her left hip pain." Id.

The court previously focused on fibromyalgia as an impairment.

Fibromyalgia typically involves characteristics of chronic pain, stiffness, and tenderness of muscles, tendons, and joints without detectable inflammation.  It is common for a large majority of patients with fibromyalgia to suffer from undue fatigue and sleep disorders. . . . Fibromyalgia is considered an arthritis-related condition.  However, it is not a form of arthritis . . . since it does not cause inflammation in the joints, muscles, or other tissues or damage them.   But fibromyalgia can (like arthritis) cause significant pain and fatigue and it can similarly interfere with a person's ability to carry on daily activities. . . . Mental and/or emotional disturbances occur in over half of people with fibromyalgia. These symptoms include poor concentration, forgetfulness, and memory problems, as well as mood changes, irritability, depression, and anxiety. . . . Other symptoms of fibromyalgia include migraine and tension headaches, numbness or tingling of different parts of the body, abdominal pain related to irritable bowel syndrome. . . . Any of the above symptoms can occur intermittently and in different combinations.

Cumella v. Colvin, 936 F. Supp. 2d 1120, 1126-27 (D.S.D. 2013) (internal citations and quotation marks omitted).  "Fibromyalgia is an elusive diagnosis; '[i]ts cause or causes are unknown, there's no cure, and of greatest importance to disability law, its symptoms are entirely subjective.' " Tilley v. Astrue, 580

F.3d 675, 681 (8th Cir. 2009) (quoting <u>Sarchet v. Chater</u>, 78 F.3d 305, 306 (7th Cir. 1996)).

Dr. Bassing saw Ms. Christofferson in January and March of 2014 and then again in October 2015. (Docket 14 ¶¶ 65, 77 & 141). Initial laboratory testing noted a "positive ANA[21] . . . elevated CRP[22] and ESR.[23]" <u>Id.</u> ¶ 66. Dr. Bassing's original conclusion was that Ms. Christofferson "likely had mild Sjogren's syndrome, but Sjogren's did not explain her pain." <u>Id.</u> ¶ 70. In March 2014, Dr. Bassing charted that Ms. Christofferson "had struggled with chronic back pain for several years, the most bothersome at the left mid-thoracic region, as well as chronic low back pain radiating to the left hip." <u>Id.</u> ¶ 79. Then in October 2015, after considering Ms. Christofferson's on-going chronic pain complaints and based on the doctor's physical examination and observation that "[s]he had multiple tender trigger points," Dr. Bassing concluded her patient met the diagnostic criteria for fibromyalgia. <u>Id.</u> ¶ 143. "Her most bothersome symptoms continue to be extreme chronic fatigue and generalized nonfocal pain." <u>Id.</u> ¶ 146. In December 2015, Dr. Dietrich

[21]"The antinuclear antibody (ANA) test is used as a primary test to help evaluate a person for autoimmune disorders that affect many tissues and organs throughout the body (systemic) and is most often used as one of the tests to help diagnose systemic lupus erythematosus (SLE)." (Docket 14 at p. 72).

[22]"This test identifies the presence of inflammation and monitors response to treatment of an inflammatory disorder." (Docket 14 at p. 73).

[23]"ESR. The erythrocyte sedimentation rate, is done to detect the presence of inflammation caused by one or more conditions such as infections, tumors or autoimmune diseases; to help diagnose and monitor specific conditions such as temporal arteritis, systemic vasculitis, polymyalgia rheumatica, or rheumatoid arthritis." (Docket 14 at p. 73).

modified his diagnosis to include chronic pain syndrome and fibromyalgia.  Id. ¶ 148.

Dr. Bassing, a rheumatologist, and Dr. Dietrich, a psychiatrist, as Ms. Christofferson's treating physicians for several years are in the best position to observe the progressive nature of her chronic pain.  The progression of symptoms and the evolution of medical care to the ultimate diagnosis of fibromyalgia by Drs. Bassing and Dietrich is "new," "non-cumulative" evidence which is "relevant" to the time period before the ALJ's decision.  Woolf, 3 F.3d at 1215.  "Fibromyalgia is an elusive diagnosis."  Tilley, 580 F.3d at 681.  The court finds good cause exists as Ms. Christofferson did not have "the opportunity to obtain this new evidence before the administrative record closed."  Hepp, 511 F.3d at 808.

"The additional evidence outlines the progress of [Ms. Christofferson's] condition from before the ALJ's decision, culminating in" the doctors' diagnoses of fibromyalgia only a few months later.  Bergmann, 207 F.3d at 1070.  "The evidence is new because it describes deterioration and provides, for the first time, a conclusive [medical] determination of" fibromyalgia.  Id.  "It is material because, although it involves deterioration, that deterioration occurred over the course of [Drs. Bassing's and Dietrich's] treatment, specifically including the time period before the ALJ."  Id.   The failure of the Appeals Council to consider this new, non-cumulative, material evidence constitutes reversal error.  Box, 52 F.3d at 171.

These records relate back to the pre-decision era and provide a clear explanation for Ms. Christofferson's chronic pain. Supported by pre-decision records, as well as those following in close proximity over the next several months, the diagnoses by Drs. Bassing and Dietrich show Ms. Christofferson's impairment "significantly limits [her] physical and mental ability to do basic work activities." 20 CFR § 404.1520(c). The longitudinal medical records support the conclusion Ms. Christofferson's fibromyalgia has lasted longer than 12 months. 20 CFR § 404.1509. Her fibromyalgia constitutes a severe impairment. 20 CFR § 404.1521.

The Commissioner argues that because the ALJ found other severe impairments, any failure to include fibromyalgia as a severe impairment would be harmless error. (Docket 18 at pp. 5-6). This argument is without merit. Failure to consider a known impairment at step two is a ground for reversal. Colhoff v. Colvin, No. CIV. 13-5002, 2014 WL 1123518, at *5 (D.S.D. Mar. 20, 2014).

The decision of the ALJ must be vacated so this new, relevant evidence can be considered. Remand is appropriate for another reason. Failure to identify all of a claimant's severe impairments impacts not only the ALJ's credibility findings, consideration of activities of daily living, but most importantly, a claimant's residual functional capacity. "[F]ailure to consider plaintiff's limitations . . . infect[s] the ALJ's . . . further analysis under step four." Spicer v. Barnhart, 64 Fed. Appx. 173, 178 (10th Cir. 2003).

## ORDER

Based on the above analysis, it is

ORDERED that plaintiff's motion to reverse the decision of the Commissioner (Docket 15) is granted.

IT IS FURTHER ORDERED that the defendant's motion to affirm the decision of the Commissioner (Docket 17) is denied.

IT IS FURTHER ORDERED that, pursuant to sentence four of 42 U.S.C. § 405(g), the case is remanded to the Commissioner for rehearing consistent with the court's analysis.

Dated March 6, 2018.

BY THE COURT:

/s/ *Jeffrey L. Viken*

JEFFREY L. VIKEN
CHIEF JUDGE